Jon D. Graves, Legal Counsel, SC #10554
Hutchinson Correctional Facility
P.O. Box 1568
Hutchinson, KS 67504-1568
Telephone: (620) 728-3211

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FILED

AUG 2 5 2004

RALPH L. DeLOACH, Clerk
By _____ Deputy

| | |
|---|---|
| KEVIN GRAY #43848 and  MARSHA GRAY, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | Case No. 00-3133-GTV |
| L.E. BRUCE,  et al. ) | |
| ) | |
| Defendants ) | |
| ) | |
| KEVIN GRAY #43848 and MARSHA GRAY, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Case No. 00-3148-GTV |
| ) | |
| L.E. BRUCE, et al. ) | |
| Defendants. ) | |

## REPORT IN "MARTINEZ v. AARON" INVESTIGATION
## CIVIL RIGHTS COMPLAINT

On April 20, 2000 and April 27, 2000 respectfully, actions were filed in the United States

District Court for the District of Kansas by Plaintiffs, Kevin Gray, an inmate incarcerated in the

custody of the Secretary of Corrections of the State of Kansas who was then confined at the

Central unit of the Hutchinson Correctional Facility located in Hutchinson, Kansas, and Marsha

Gray, wife of Kevin Gray.

Plaintiff  sued Defendants, L.E. Bruce, Warden of Hutchinson Correctional Facility,

Charles Simmons, Secretary of Corrections, Mary Nelson, Intelligence and Investigation Officer,

Sam Cline, Deputy Warden at Hutchinson Correctional Facility, William L. Cummings, Secretary of Corrections Designee and Risk Management Officer and two unknown HCF/KDOC Correctional Officers. (Complaint 3133, par. A2 & 3, Complaint 3148, pgs. 4 - 14)

Plaintiffs sought to proceed with a civil rights complaint pursuant to 42 USC § 1981, 1983, 1985, 1986, 1988, 2000e 28 U.S.C.A. § 2201, 28 USCA 1343, 28 USCA 2281 and 28 USCA 2284, raising claims under the Fourth, Fifth, Sixth, Eighth and Fourteenth amendments. Plaintiffs further stated that the acts committed by these Defendants were performed under color of law. Defendants were being sued in their individual capacity for monetary damages and in their official capacity for injunctive and declaratory relief judgment. (Complaint 3133, par. A3, Complaint 3148, pgs. 4 – 14)

Plaintiffs state the Plaintiff Marsha Gray on November 13, 1999 went to visit her husband Kevin Gray at the Hutchinson Correctional Facility (HCF). While being processed for the visit Marsha was told by HCF visiting security officers that she would have to allow them or let them conduct a swab test on/of her body with a drug swabbing test cloths, so they could extract fluids and body samples from her body surfaces for the purposes of submitting her body fluid samples into or through a drug scanning machine and testing device to determine if she had been using or was in possession of any illicit or medication drugs.

The cases, consolidated into one action, were summarily dismissed in their entirety by the district court.

The plaintiffs appealed to the 10th circuit court of appeals, which remanded the case to the district court with directions that three causes of action remained to be addressed (paraphrased by the author as follows): 1) Whether plaintiff Marsha Gray was subjected to an unreasonable search under the Fourth Amendment when an alert for a controlled substance from the ion scan device was used to screen inmate visitors would lead to a more intrusive search; 2)

2

Whether the swab search violated plaintiff Marsha Gray's Fifth Amendment right to be free from self-incrimination; and 3)  Whether, because plaintiffs are an interracial couple, plaintiffs' visitation privileges were dealt with more harshly than was the case with similarly situated white race couples, so as to present an equal protection claim actionable under 42 U.S.C. §1983.

## UNCONTROVERTED STATEMENT OF FACTS

1.      Plaintiff, Kevin Gray,  is an inmate legally incarcerated in the custody of the Secretary of Corrections, State of Kansas, serving a sentence for the crimes of rape (3) and attempted rape.  Plaintiff was housed at the Central Unit of the Hutchinson Correctional Facility when he filed the complaint in 1999, and presently resides at the Ellsworth Correctional Facility having been moved there on November 6, 2003.  (Exhibit 1)

2.      Plaintiff, Marsha Gray, is believed to presently reside at 210 S. Washington Avenue in Burns, Kansas.

3.      Defendant Louis E. Bruce is the Warden of the Hutchinson Correctional Facility and states as follows:

> I am the warden at the Hutchinson Correctional Facility and became so employed at this facility in August of 1999, although I became employed with the Kansas Department of Corrections in October of 1980 and have previously served at other correctional facilities in the state in most security and administrative capacities and most recently as a Deputy Secretary of Corrections, prior to coming to HCF.
>
> I am aware of the circumstance of inmate Gray and of his wife Marsha Gray involving an alert on Mrs. Gray on November 13, 1999, on the Ion Track/Ioniser machine which gave a positive indication for heroin.
>
> I am aware that Mrs. Gray was then offered the opportunity to submit to either a backscatter body scan or to a strip search and that she refused both.
>
> I am aware the Mrs. Gray asked what drug was indicated by the machine, refused the opportunity to submit to either a backscatter body scan or to a strip search and, upon a successful completion of that search, to enjoy a non-contact visit with her husband. Instead, Mrs. Gray chose to leave the facility, being fully aware that she could lose her visiting privileges for one year, as provided by policy..

3

Mrs. Gray chose to leave without a search and her visitations privileges were indeed suspended for a period of one year, as provided for by policy.

I understand that the Grays are maintaining that other inmates were treated more preferably than the Grays regarding the impact on visitation privileges of a positive alert from the Itemizer

The concern about inmate visitors smuggling drugs and other contraband into the facility directly relates to the safety and security of the facility. The type of search conducted on Mrs. Gray was non intrusive, being only a skin swab, and the further proposed search needed only to be a fully clothed body scan which would be visible to no one else but a same sex viewer. Mrs. Gray submitted without objection to the initial swab test and refused the secondary test. She was advised that her refusal could result in a suspension of her visitation privileges for up to a year, and she proceeded to leave anyway.

I did not consider the race of plaintiffs in approving the one year suspension of Plaintiff Mrs. Gray's privilege to visit her husband in person while he remained incarcerated with the Kansas Department of Corrections. I doubt I had any idea of the race of either plaintiff when I reviewed the request to suspend her visits for a year and did so. Race is simply not something to be considered in regard to the granting, modification or suspension of visiting privileges.

Mr. and Mrs. Gray received fair treatment regarding their visiting privileges in light of facility policies, in light of their lengthy record of malfeasance and in light of the security concerns of the facility.

Any actions I took or did not take were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or non-business capacity. (Exhibit 2)

4.    Defendant Mary E. Nelson, is the Lieutenant of Intelligence and Investigations Department at the Hutchinson Correctional Facility and states as follows:

I am presently employed as Lieutenant of the Intelligence and Investigations Department at the Hutchinson Correctional Facility. At the time the facts arose upon which the Gray's claims are based, I was a Master Sergeant in the same department at the same facility. I have been employed with the Department of Corrections since December 1986. I received a Bachelor of Science degree in Health, Physical Education and Recreation from Fort Hays State University in 1979, a Master's degree in Recreation and Parks Administration from Eastern Kentucky University in 1982 and a second Master's degree in Administration of Justice from Wichita State University in 1995.

I was involved with the application by the Hutchinson Correctional Facility to the federal government for a drug interdiction grant. The grant was approved and the Ion Track machine, also known as the Itemiser and the Backscatter machine were both

4

purchased with such grant money and were involved in fulfilling the requirements of the grant given to the facility. After the grant had been awarded to the facility, I was involved with the implementation of the grant and the operation of the resultant program of drug interdiction.

The initial test from the Ion Track was nothing more intrusive than drawing a small sampling pad across the subject's arm or hand. The pad was then placed in the Itemizer and was checked for traces of certain drugs.

The Ion Track was one of two similar types of machines considered for use at the Hutchinson Correctional Facility in connection with the grant. Previous warden Robert Hannigan decided which one would be used after returning to the facility after viewing them both in operation.

The Ion Track machine is not a device which establishes the guilt or innocence of someone in regard to their contact with the substances for which detection is being sought, but is instead one of many tools available to focus or to relieve suspicion. The fact that someone alerts for a given substance does not mean they presently or recently possessed a controlled substance. It does mean that the machine has detected ions of the specified substance on the hand of the person and that further investigation is appropriate before permitting the visitor to enter the secured area of the correctional facility.

Upon the receipt of a positive scan result, the subject would then be offered a choice of submitting to a strip search or a clothed full-body scan by the Backscatter machine, which scan would indicate the presence of any unusual items on or in the person being scanned. The backscatter machine, a minimally invasive way to search someone, especially as compared to a strip search, is an x-ray type machine which takes a picture of the subject person and shows the presence of things concealed underneath clothing or inserted into the body.

If the subject of the alert passes the scan or strip search, he or she would be permitted to have a non-contact visit that day and would return to normal contact visits the next time, assuming the inmate was entitled to contact visits and assuming the visitor passed the Ion Track machine test the next time she visited. The visitor would also be told that if he or she left without submitting to a search that their visitation privileges would be requested to be suspended for one year.

I conducted an investigation into an alert at the Central Unit of the Hutchinson Correctional Facility on Plaintiff Mrs. Marsha Gray on November 13, 1999, on the Ion Track machine which gave a positive indication for heroin.

I told Mrs. Gray that the machine had alerted on her for drugs, but that we were not accusing her of using drugs or of having drugs in her possession. She asked me what drug the machine had alerted to and I told her "heroin".

At that point Mrs. Gray turned from me, walked directly to Corporal Dalke, who was working the gatehouse security post, and requested the return of her driver's license, which was left as a part of the visitation procedure.

Mrs. Gray then stated something to the effect that "I am leaving" and exited the building and drove out of the parking lot. It was and is facility policy to permit a visitor to leave the gatehouse without being detained, but with the expectation that leaving may impact the visitor's privileges regarding the facility for a period of time.

She then contacted her husband's Unit Team person, Charles Rudicel, by telephone, discussed the matter with him, advising that she refused the search by leaving the gatehouse after the Ion Track machine alerted on her and asking to talk with her husband, plaintiff Kevin Gray.

Because I regarded Mrs. Gray's rapid departure from the facility without submitting to a further search a refusal, I requested the Warden to remove Mrs. Gray from Mr. Gray's visiting list for one year, as is permitted by state regulation, department policy and facility order.

Mrs. Gray chose to leave without a search and her visitations privileges were suspended by the Warden for a period of one year, as provided for by Kansas Administrative Regulation 44-7-104(a)(8). Other relevant policies which direct the same result include Hutchinson Correctional Facility General Orders 9-107 and 16-101, and Internal Management Policy and Procedures 10-113 and 12-115

Any actions I took or did not take were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or non-business capacity. (Exhibit 3)

5.      Defendant Charles E. Simmons is the Deputy Secretary of Facilities Management

of the State of Kansas Department of Corrections and states as follows:

At all times relevant to Plaintiff's claim I was employed as the Secretary of Corrections for the State of Kansas Department of Corrections.

I am ultimately responsible for policies and actions of the Kansas Department of Corrections, but have had no direct contact with plaintiff Kevin Gray #43848 or with the matters in his petition regarding complaints about the suspension of visiting privileges of his wife, plaintiff Marsha Gray, due to an alert on her relating to illegal drugs at the time she was attempting to enter the Hutchinson Correctional Facility on November 13, 1999, to visit with plaintiff Kevin Gray.

Mr. Gray did send a grievance to my office, but my designee responded to it in lieu of my direct involvement.

Any actions I took or did not take regarding either petitioner in November of 1999 were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or non-business capacity.(Exhibit 4)

6.      Defendant William Cummings is a Corrections Manager II for the State of Kansas

Department of Corrections and states as follows:

My name is William Cummings and at all times material hereto I have acted as
the Secretary of Corrections designee for the purpose of responding to plaintiff Kevin
Gray's grievance regarding the implementation and enforcement of the rules regarding
the suspension of plaintiff's visitation privileges for a year.

I had no direct involvement with the underlying subject matter of Mr. & Mrs.
Gray's complaints and only responded to the single grievance appeal, which reached
central office.

In the matter of responding to Plaintiff Kevin Gray's grievance appeal in
grievance Number BA00008488, I was not directly involved with the decision making
but only in reviewing the underlying decisions as the Secretary's designee.

Any actions I took or did not take regarding either plaintiff in November of 1999
were performed within the scope of the duties of my position of employment with the
State of Kansas and not in any personal or non-business capacity.  (Exhibit 5)


7.      Defendant Sam Cline is the Warden of the Ellsworth Correctional Facility and

states as follows:

During November of 1999 I was employed as a Deputy Warden at the Hutchinson
Correctional Facility.  I first began working at the facility as a corrections officer in 1982
and continued in a variety of roles including deputy warden of Programs and later of
Operations at HCF from 1999 until  August 1, 2003, when I was promoted to the position
of  Warden III  at the Ellsworth Correctional Facility.

I was involved with the effort of the facility to obtain a federal drug interdiction
grant and served as the program director once the grant was received.  The two machines
in use at the central unit of the Hutchinson Correctional Facility, the Ion Track/Itemiser
and the Backscatter machines, were purchased through the funding provided from the
drug interdiction grant.  Mary Nelson handled the implementation of the program and
was the person who conducted the day to day operations.

I know petitioner Kevin Gray who is presently housed at the Ellsworth
Correctional Facility where  I am the warden; while conducting my duties I do see Mr.
Gray occasionally.  Looking back to November of 1999, I can recall that inmate Gray
was familiar to me with issues related to inappropriate conduct while in visitation. These
issues were managed through the disciplinary process as I recall.   I also remember that I
was phoned by Mrs. Gray and discussed with her the issues and outcomes regarding their
visitation privileges. I have not met Mrs. Gray personally.

7

I was indirectly involved in the decision to suspend visits of the petitioners at the facility in November of 1999 and was not directly involved with the subject matter of their lawsuit to the best of my recollection. I certainly did not make any decisions regarding the petitioners based on the race of either person, nor on the matter that the two of them were married to each other.

Any actions I took or did not take at the Hutchinson Correctional Facility regarding either petitioner in November of 1999 were performed within the scope of the duties of my position of employment with the State of Kansas and not in any personal or non-business capacity. (Exhibit 6)

8.      Plaintiff Kevin Gray pursued the grievance procedure regarding the subject matter

of his complaint in grievance BA00008488 dated December 15, 1999, resulting in the following

grievance and the responses from the state as follows:

### A.      PETITIONER'S GRIEVANCE

"On Oct. 31, 1999, my wife and I was told by Sgt. Hurt we could not correct our granddaughter, which was by making her sit in a chair at our table for time out. According to the visitors Handbook, "Parents or guardians are responsible for the supervision and behavior of their children. Your visit will be terminated if your children are being disruptive in any manner." She is only three years old and we do try to make her mind, but it is really hard to keep her still. Sgt. Hurt told us that if we did not stop doing what we were to her (our granddaughter) our visit would be terminated. So my wife and I let her run around. Sgt. Hurt wrote a narrative on this matter. On No. 7, 1999, my wife left early check in which is at 11:00 a.m., so he could take some Ibuprofin (sic) for her magraine (sic). Again the vistors handbook states: "Visitors are allowed to leave before noon and are allowed to return again at noon. But if they depart after noon hour the visit is over for the day." My wife return at the afternoon check in which is at 11:30 a.m., which the Handbook states again, "Visitors are allowed to check in 30 minutes prior to the start of the visiting period which is at 12:00 noon." My wife checked in at the gatehouse and went to the outside visiting area, she found a table and told her that I was a level 2 and that I left so that meant that she could not come back in and she would have to leave. Sgt. Hurt also wrote a narrative on this also. Two days later, I found out that Sgt. Hurt had enforced a rule that hadn't even been published yet. In Sgt. Hurt narrative, she said that my wife threw her visitor pass at an officer Dane and hit her in the foot. Officer Dane was asked about this, and she said she didn't say that. On Nov. 11, 1999, this was a good day, my wife and I had no problems because Sgt. Hurt was not in the visiting room. On November 13, 1999, the day my visits were taken from me and my wife for one year my wife refused to be stripped search and x-rayed, being subject of unlawful and unconstitutional strip search of person via x-ray machine without due process and without probably cause and without search warrant being issued by a neutral and detached magistrate violations of the 4, 5, 6 and 14th Amendment of the U.S. Constitution. HCF has a machine called an Ion Drug Scanning machine which can tell if you have been

8

using drugs or any kind of medication. My wife was also subject of unlawful and unconstitutional seizure of bodily fluids from her person without due process, without probable cause to unlawful and unconstitutional of search and seizures by virtue of defendant fraudulent activivites of misleading my wife to think all outside visitor must submit to and be strip searched via x-ray machines and that all outside visitor must submit to seizure of bodily fluids via drug swabbing test. Activities conducted by I & I (Mary Nelson) HCF security official as a pre request to being allowed by Kansas law to visit friends, family and loves one incarcerated under the jurisdiction of KDOC all in violation of 4, 5, 6 and 14th Amendment of U.S. Constitution. The event on Nov. 13, 1999 was nothing but retaliation because I was able to prove that Sgt. Hurt did my wife and I, wrong by not letting us visit that afternoon. A memo came out a couple days later enforcing the old visiting rule book until the new one is published. My wife has been coming to HCF-C for some time now and not once has she had any problems with the Ion machine since they have had it in here, which is about a year I believe until now. The letter I received from Mr. Bruce gave nothing pursuant to IMPP's or General Orders, he gives no reason. I know of other visitors that refused to be searched and or x-rayed, some did not lose their visits, others lost their visits, but not as long as me or my wife did. David Partridge, his parents refused, didn't lose their visits, Eddie Lowrance, his wife refused, lost their for 6 months, Harvey O'Conner his wife refused, lost their for four months, Harvey was also rolled form the south unit for having green money in his shoe after a visit, still have his visit till this day. Scott Riener his woman large amount of marijuana, but they never lost their either and myself and my wife, we lost our visit for 1 year of the five men four and their visitors are white, but myself, I'm Black and my wife is white, which subject my wife and myself to unlawful and unconstitutional pusishment (sic) and treatment, suspension of myself and my wife visiting privileges and consortium rights with my wife and her with me, for one year cause of and for my wife refusal to submit to Mary Nelson (I & I) unlawful, unconstitutional search of my wife body anatomy via by use of x-ray machine, without probable cause without due process and without search warrant being issued by netural and detached magistrate in violation of 4, 5, 6 and 14th Amendments of U.S. Constitution. I have shown a pattern of harassment favoritism and racism. The favoritism comes in when the Ion machines goes off, and they go through your unlawful and unconstitutional x-ray, some people have non-contact visits, and other, they just let them on through the only prison that has this machine is Hutchinson, Lansing had one but lost it and El Dorado has never had one. Unit Team McLaurine CCII tested positive for cocaine and according to your Policy, for officers and staff, if they test positive on the Ion machine for any kind of drug they are suspended for 3 days with pay and when they return to work, take a urine test. Why wasn't Unit Team McLaurine suspended? And why didn't he have to give a urine test? Favoritism! Also on 11/20/99m and 11/26/99, my daughter and my granddaughter came to see me, on both of those days the Ion machine was down and so was the x-ray machine. This seems rather strange to me. David Logan who is out at the East, his wife also tested positive, I think cocaine, I'm not sure, But anyway, she was strip search, then left and when she came back, was strip search again, but after that visit, he lost his visit for 90 days, I don't understand why I got a year. Inmate Ronnie Relf, who Aunt brings up his two daughters, she tested positive on the machine. Mr. Relf received a non-contact visit, Mr. Bill Tucker, Jr. daughter and grandson, his daughter tested positive for heroin, but she was allowed to come visit her father. The list goes on and one my wife wrote you a letter on 11/22/99, in that letter is only a few names in their, their are more names but with these

names, we have shown what we need to show. If you will look further in this matter, you will see what we were saying, like my wife, I would like this matter to be resolved."

## B. "GRIEVANCE RESPONSE BY UNIT TEAM

The grievance was handled by Unit Team member Garwood , which response dated

December 10, 1999, stated as follows:

"In your grievance dated 12-3-00, you say that on October 31, 1999, you were warned by the visiting officers about how you were correcting your granddaughter's behavior during the visit with your wife. Secondly, you express your displeasure about your wife not being allowed to visit you the afternoon of November 7, 1999, because she had visited you that morning and had left the premises, returning at approximately 11:30 a.m. to continue her visit with you. Thirdly, you are questioning why your visits with your wife have been suspended for one year when other inmates received lesser suspensions for violations of the visiting policy. Finally, you state that the use of the bodyscan or X-ray machine for body searches is unconstitutional.

First the officers acted appropriately when they warned you about the excessive disciplining of your granddaughter. Secondly, the Hutchinson Correctional Facility visiting policy states that once visitors leave the premises after a visit, they are not allowed to return to visit that day. HCF General Order #16-101, Inmate Visiting, specifies that if any visitor refuses to be searched, that person may be prohibited from visiting any HCF facility for a specified period of time in accordance with IMPP 12-115, Search of Visitors. It was determined by the warden, in this case, that the period of suspension should be one year. Finally, HCF recently obtained the bodyscan machine through a federal drug interdiction grant, and is presently the only facility in Kansas to have one. The machine enhances the ability for officers to detect the presence of drugs on the person of visitors coming into the facility. The monitor is positioned so that only the operator of the machine can see it. HCF will continue to monitor visitors for the possible introduction of contraband, in accordance with existing policy.

In regard to your concern about how employees are discipline for violation of policy, this is a matter that is investigated and decided by the warden, and any findings are necessarily confidential. Decisions for disciplinary action are made on a case-by-case basis, regardless if it involves an inmate or a staff member.

No further action is warranted."

## C.     WARDEN'S RESPONSE

Plaintiff was not satisfied with that response and appealed the matter to the Warden on

December 14, 1999. Warden Bruce responded as follows:

"**FINDING OF FACT** -  I have reviewed the response provided to you by your unit team on the above reference matter.

**CONCLUSIONS** – Please be advised that my office concurs with the response of your unit team and the unit team's response shall serve as my final response to this grievance.

**ACTION TAKEN** – None warranted.  If you are not happy with my position on this matter you have the right to appeal this grievance to the Secretary of Corrections office within three (3) days of being notified of this decision."

Plaintiff then appealed the matter to the Secretary of Corrections on December 21, 1999, stating

as follows:

"The Principal Administrator should of looked into this matter much further than he did, but since he didn't the problem is still there.  1)  If the visiting officers thought if I was excessive disciplining my granddaughter then why wasn't my visit terminated? Because according to the vistor (sic) handbook: "Parents or guardians are responsible for the supervision and behavior of their children.  Your visit will be terminated if your children are being disruptive in any manner.  2) HCF visiting policy, with this new rule about once you leave you can't come back, well this started 12/1/99, when this happened to me, it was 11/7/99, the old rule was still in, you can leave, as long as it was before 12:00 pm and return, a memo was put out, this would still be in affect until the new policy was out.  3) its awful funny, that certain people that the warden determine to suspend visit for a year, happen to be 90% black inmates, and most of the white inmate lost their for 4 to 6 months.  And certain employee, who are white can do what they want?  Why do HCF have any Policy?  They don't follow them until they want to!  If my visit was suspended for a 1 year, they should have been for 6 months instead.  If that, If you going to do it for the white inmates then do it for us also.  All I'm asking lets be fair about this, if we are going to be fair!"

## D.   SECRETARY OF CORRECTIONS' RESPONSE

The Secretary of Corrections' designee, William L. Cummings, responded in grievance

#BA00008488 on December 23, 1999, as follows:

"**FINDINGS OF FACT**

The response provided to the inmate by staff at the facility is incorporated herein by reference and made part of this response.

On appeal, the inmate offers no evidence or argument that suggests that the response provided to the inmate by staff at the facility is wrong.

11

**CONCLUSIONS MADE**

The response provided by the warden is appropriate.

**ACTION TAKEN**

None further."

(Exhibit 7)

9.      Kansas Administrative Regulation 44-7-104 addresses inmate visitation and searches of visitors.  The current version of the rule has been in effect since 1994. (Exhibit 8)

10.     Internal Management Policy and Procedure 10-113, which was in effect on November 13, 1999, addresses Inmate Visitation, including termination and suspension of visits and visitor searches.  (Exhibit 9)

11.     Internal Management Policy and Procedure 12-115, which was in effect on November 13, 1999, addresses visitor searches.  (Exhibit 10)

12.     Hutchinson Correctional Facility General Order 09-107, which was in effect on November 13, 1999, proscribes the drug interdiction procedures followed at the Hutchinson Correctional Facility, including screening and strip searches. (Exhibit 11)

13.     Hutchinson Correctional Facility General Order 16-101, which was in effect on November 13, 1999, addresses inmate visiting, including visiting hours, contraband, search of visitors, and violations. (Exhibit 12)

14.     Mrs. Gray, up to the time of her refusal, had a comparatively long and troubled history with the department of corrections, as did her husband, co-plaintiff Kevin Gray.

A.      Mrs. Gray, then known as Struckman, but whose name appeared as Stewart on the subsequent marriage license, was a correctional officer at the El Dorado Correctional Facility until she was terminated on January 14, 1993, for unsatisfactory work performance, because she developed a relationship with Kevin Gray. (Exhibit 13)

B.      December 9, 1993, inmate Gray failed a urine test and pled guilty to using drugs.  He received a sentence of 7 days disciplinary segregation, paid $3.90 as restitution for the drug test and had his contact visits terminated for 90 days. (Exhibit 14)

12

C.       In April of 1994, Mrs. Gray sought permission from the warden at the El Dorado Correctional Facility to marry Kevin Gray in a ceremony at the facility, but was denied because they had not attended three marriage preparation counseling sessions and because the two year prohibition against a former staff member visiting an inmate had not expired. They were subsequently married on June 20, 1995. (Exhibit 15) (See also exhibit 23)

D.       October 7, 1995, Mrs. Gray was stopped at the control center, due to intelligence received by investigators. Mrs. Gray admitted that she, at her husband's request, was attempting to bring two balloons of drugs into the facility. Mr. Gray received a disciplinary report for this attempt and was sentenced to 21 days disciplinary segregation, 30 days restriction, 3 months loss of good time and a $20 fine. Additionally, Mrs. Gray's visiting privileges were suspended for a year. (Exhibit 16) (See also Exhibit 24)

E.       September 11, 1997, Mr. Gray was written a disciplinary report for use of stimulants because his urine tested positive for drugs, specifically THC. He was convicted as charged and was sentenced to 14 days disciplinary segregation, 30 days restriction, 3 months loss of good time and a $20 fine. Again, his contact visitation privileges were suspended for 90 days. (Exhibit 17)(See also Exhibit 25)

F.       In early 1998 Mr. Gray was written a disciplinary report for use of stimulants, in case 8-03-093, which was dismissed on March 12, 1998, for an unknown reason. Mr. and Mrs. Gray both complained about the report being written, even though it was dismissed. (Exhibit 18)

G.       On April 17, 1999, Mr. Gray was written a disciplinary report for disobeying orders and for lewd acts arising out of the event of Mrs. Gray masturbating him to climax in the visiting room, while in the proximity of other visitors and of Mrs. Gray's two year old granddaughter. Mrs. Gray's visit was terminated and Mr. Gray was placed on non-contact visits for 90 days. He also received a sentence of 14 days disciplinary segregation (suspended for 90 days), 30 days restriction and 3 months loss of good time. (Exhibit 19)

H.       On October 24, 1999, Mr. Gray was noted as behaving inappropriately with Mrs. Gray's two year old granddaughter, by grabbing her, slapping at her face, cursing at her and poking his fingers in the child's face. (Exhibit 20)

I.       Then came the event of November 13, 1999, in which Mrs. Gray had the Itemizer alert on her for heroin and then refused any further search and left, even though she knew the investigating officer would request that Mrs. Gray be removed from Mr. Gray's visiting list for a year. (Exhibit 21)

13

15.    A review of petitioner Kevin Gray's central file for the time in custody preceding

November 13, 1999, reflects a history of visitation suspension relating to drug use and other

disciplinary matters:

A.    December 9, 1993, the file reflects that Petitioner was placed on non-contact visits for a minimum of 90 days after a positive drug screen. (Exhibit 22)

B.    The petitioners sought permission from the warden at the El Dorado Correctional Facility for them to be married in April of 1994, but petitioner Marcia Gray was advised that because she had been employed as a correctional officer at that facility that she would have to wait the mandatory two years before she could visit at the facility to become married to petitioner Kevin Gray, although Marcia was advised that she could achieve the goal of becoming married to Kevin by common law or by proxy. The parties were married by Judge William F. Lyle at the Hutchinson Correctional Facility on June 20, 1995. (Exhibit 23) (See also Exhibit 15)

C.    On October 7, 1995, Petitioners were involved with a scheme to smuggle drugs into the prison and visitation between the two was suspended for one year. (Exhibit 24) (See also Exhibit 16)

D.    On September 11, 1997 petitioner Kevin Gray failed a drug screen and received a disciplinary report for use of stimulants. He was advised that contact visitation with his visitors was suspended for 90 days. (Exhibit 25)(See also Exhibit 17)

E.    In March of 1998 petitioner was charged with use of stimulants in case 08-03-093, which case was subsequently dismissed and is known of only because of Plaintiffs' complaints. (Exhibit 18)

F.    March 17, 1999, petitioner Kevin Gray was charged with disciplinary rule violations for disobeying orders and for lewd acts, both relating to the act of Petitioner Marsha Gray apparently masturbating him during a contact visit. Petitioner was convicted as charged and was placed on 90 days non-contact visits. (Exhibit 26)

G.    April 23, 2001, petitioner Kevin Gray's status that he would receive only non-contact visits for a year (September 26, 2000 to September 26, 2001) due to his conviction for use of stimulants, his second such conviction in a three year period. (Exhibit 27)

H.    May 6, 2003, petitioner Marsha Gray was denied visiting privileges with petitioner Kevin Gray while he was housed at the Lansing Correctional Facility. The denial was attributed to the fact the while petitioner Marsha Gray was an employee with the state of Kansas that she established the relationship with an inmate, petitioner Kevin Gray, and that it would not be in the best interest of the facility to approve such visits. (Exhibit 28)

14

16.     Plaintiffs complained about disparate treatment as compared to others who may

have had an alert on them from the Ion Tracker machine.  The following is a list of those names

and results with the supporting text following.

A.      A special investigations file was prepared by Mary Nelson
        regarding the incident involving plaintiffs on November 13, 1999.
        (Exhibit 21)

B.      Inmate Harvey O'Connell's wife Sarah came to the Hutchinson
        Correctional Facility for a visit on February 10, 1999.  She was
        being watched as possibly trying to smuggle drugs into the facility.
        She initially indicated in the gatehouse while waiting to enter and
        to visit her husband that she had forgotten her identification in the
        vehicle.  She was accompanied back to the vehicle and could not
        find it.  The officer accompanying her authorized her to return
        home to get the ID and to return.  Upon returning she was advised
        that her visit was terminated.  She was subsequently advised that
        her visiting privileges with her husband were suspended for 6
        months.  When the warden came to know that Mrs. O'Connell had
        not refused to submit to a search, but was permitted to leave by the
        officer, the visitation was reinstated on a non-contact basis for 6
        months. (Exhibit 29)

C.      Inmate Eddie Lowence's wife, Mary Brooks, had a canine alert on
        her February 6, 1999. Upon refusing a search, Mrs. Brooks visiting
        privileges were suspended for a year.  Sometime later, limited
        privileges were reinstated so that non-contact visits were permitted
        for 6 months. (Exhibit 30)

D.      Inmate David Partridge's visitor, John Partridge, had a positive
        alert for PCP through the Ion Track machine on August 1, 1999.
        The visitor submitted to a Backscatter search, had a negative result,
        and was permitted a non-contact visit.(Exhibit 31)

E.      Inmate Jimmy Searles' wife Donna alerted on the Ion Track
        machine on August 3, 1999, for EDME.  She submitted to a
        Backscatter search, with negative findings, and a non-contact visit
        was established. (Exhibit 32)

F.      Inmate Ronnie Relf's visitor, ReginLynn McCoy had an Ion Track
        alert for morphine on October 31, 1999.  She consented to a
        backscatter machine search with negative results and a non-contact
        visit was established. (Exhibit 33)

G.      Inmate Scott Reiner's visitor, Patty Atherton, came to visit on
        January 6, 1999.  After Atherton left the visitor's bathroom 5

15

balloons containing marijuana were found in the restroom. It was believed that Ms. Atherton introduced the drug into the restroom as a part of a smuggling operation. Atherton's visiting privileges were suspended for a year. (Exhibit 34)

H.    Inmate Bill Tucker's visitor Cherrie Stevenson had an Ion Track alert for cocaine on November 13, 1999. She consented to a backscatter search with negative results and was permitted a non-contact visit. (Exhibit 35)

Mr. Tucker filed a grievance about the incident, complaining among other things that the backscatter search was conducted in full view of everyone and was embarrassing. The report provided by Mary Nelson and the grievance response indicated that, although it was possible for an observer to watch the event of the backscatter search being conducted, the video of the search was concealed in a cabinet and was not visible to anyone except the operator who was the same gender as the subject. (Exhibit 36)

I.    Facility employee William McLaurine on August 10, 1999, alerted on the Ion Track machine for cocaine. He submitted to a backscatter search and was placed on administrative leave until the result of a urine analysis were returned to the facility human resources department. (Exhibit 37)

J.    Inmate David Logan's visitor, wife Merrile, alerted on the Ion Track machine for cocaine at the East Unit of the Hutchinson Correctional Facility. She consented to a strip search, with negative results. Because the East Unit does not have non-contact visiting rooms, a contact visit was permitted close to the observing officers. (Exhibit 38)

16.    Attached is literature for the Backscatter machine, including an example of what the picture looks like. (Exhibit 39) (See also Exhibits 31, 32, 33& 35 for actual copies of the visual record of a backscatter search)

17.    Attached is the relevant portion of the operating manual for the Ion Tracker Machine and operating procedures utilized by the Hutchinson Correctional Facility during the time frame of plaintiff's complaints.. (Exhibits 40, 41)

## CONCLUSION

The nature of the "search" conducted of the person of Plaintiff Mrs. Gray, if swabbing the skin with a small round sampling cloth is a search at all, was minimally invasive and was a reasonable response to the facility's interest in keeping drugs out of a maximum security prison.

There is no evidence that plaintiffs were treated more harshly because of the allegation by plaintiffs that they are an interracial married couple. Certainly, Mrs. Gray's long history with the department of corrections and of her violations of facility rules could legitimately be utilized in exercising discretion in how to address violations of rules by Mrs. Gray, including refusing a search after an alert for heroin. Although the author does not view a skin swab of ions on the skin surface as an incident which in any way implicates a right against self-incrimination, but the court will have to address that question as a matter of law.

Plaintiff's petition should be denied.

Respectfully submitted,

Jon D. Graves #10554

## CERTIFICATE OF SERVICE

I certify that the original and one copy of the above and foregoing "Martinez v. Aaron" report, which is to serve as being submitted for both above captioned cases, was placed in the United States Mail, postage prepaid, on this _25th_ day of August, 2004 addressed to:

U.S. District Court Clerk's Office
490 U.S. Courthouse
444 SE Quincy Street
Topeka, KS 66683

And a copy to:

    Kevin Gray #43848
    Ellsworth Correctional Facility
    P.O. Box 107
    Ellsworth, KS 67439-0107
    Plaintiff

    Ms. Marsha Gray
    210 S. Washington Avenue
    P.O. Box 31
    Burns, KS 66840
    Plaintiff

    Brian Sheern
    Assistant Attorney General
    301 SW 10th Avenue
    Kansas Judicial Center, 2nd Floor
    Topeka, KS 66612-1597

Jon D. Graves

## EXHIBIT LIST

1.  Inmate Data Summary
2.  Affidavit of Louis E. Bruce
3.  Affidavit of Mary Nelson
4.  Affidavit of Charles E. Simmons
5.  Affidavit of William Cummings
6.  Affidavit of Sam Cline
7.  Grievance #BA00008488
8.  K.A.R. 44-7-104
9.  IMPP 10-113
10. IMPP 12-115
11. HCF General Order 09-107
12. HCF General Order 16-101
13. Job Summary of Plaintiff Marsha Gray
14. Disciplinary Report in EDCF Case 93-12-025
15. Letter from Warden Nelson to Marsha Gray April 6, 1994
16. Disciplinary Report in HCF Case 5-10-075
17. Disciplinary Report in HCF Case 7-09-128
18. Correspondence between Plaintiffs, Warden Hannigan and William Cummings during March and April 1998
19. Disciplinary Report in HCF Case 9-04-213
20. Narrative Report October 24, 1999, regarding Plaintiff Kevin Gray's Behavior During Visits
21. Special Investigations File Case 99-11-024  Regarding Subject Matter of Plaintiffs' Present Action
22. Notice to Kevin Gray of Non-contact Visits December 9, 1993
23. Marriage License of Parties
24. Correspondence between Plaintiffs and Warden Hannigan during February 1996 Regarding Imposition of Non-contact Visits
25. Correspondence between Plaintiffs and Warden Hannigan during September 1997 Regarding Imposition of Non-contact Visits
26. Correspondence between Plaintiffs, Warden Hannigan and Deputy Warden Dechant during May of 1999 Regarding Imposition of Non-contact Visits
27. Disciplinary Report in HCF Case 0-09-008 and Correspondence between Plaintiff Kevin Gray and Warden Bruce April 23, 2001, Upholding 12 Months of Non-contact Visits
28. Correspondence Between Plaintiff Kevin Gray and Warden Bruce Upholding 12 Months of Non-contact Visits July 9, 2001
29. Records Regarding Inmate Harvey O'Connell
30. Records Regarding Inmate Eddie Lowrence
31. Records Regarding Inmate David Partridge
32. Records Regarding Inmate Jimmie Searles
33. Records Regarding Inmate Ronnie Relf
34. Records Regarding Inmate Scott Riener
35. Records Regarding Inmate Bill Tucker
36. Grievance 99-12-018 From Inmate Bill Tucker
37. Records Regarding Staff Member William McLaurine

38. Records Regarding Inmate David Logan
39. Backscatter Machine Information
40. Itemiser (Ion Track) Machine Operater's manual
41. HCF Policy Regarding Operation of Ion Track Machine

I, Jon D. Graves, certify that the attached are true and correct copies of records kept in the normal course of business by the Kansas Department of Corrections and the published Kansas Statutes Annotated, Kansas Administrative Regulations, Kansas Department of Corrections Internal Management Policy and Procedures, and Hutchinson Correctional Facility General Orders

_____          ___8/25/04_____
Jon D. Graves                                                  Date

Subscribed and sworn to before me this 25th day of August, 2004.

NOTARY PUBLIC - State of Kansas
RHONDA K. SEVERIN
My Appt. Exp. 11-18-06

_____

20